## IN THE COURT OF APPEALS OF IOWA

No. 24-0280
Filed April 9, 2025

IN RE THE MARRIAGE OF SARAH A. OYADARE
AND BILLY A. OYADARE

Upon the Petition of
**SARAH A. OYADARE, n/k/a SARAH A. BELLO,**
    Petitioner-Appellee,

**And Concerning**
**BILLY A. OYADARE,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, John M. Sandy, Judge.

A former husband appeals from the district court's property distribution award in the decree dissolving his marriage. **AFFIRMED AND REMANDED WITH DIRECTIONS.**

Billy A. Oyadare, self-represented appellant.

Deborah J. Morris of Tigges, Bottaro & Lessmann, LLP, Sioux City, for appellee.

Considered without oral argument by Greer, P.J., and Ahlers and Badding, JJ. Sandy, J., takes no part.

**BADDING, Judge.**

Sarah and Billy Oyadare were married for almost twenty-six years.  In the first decade of their marriage, the couple decided to separate their finances.  When Sarah petitioned for divorce years later, Billy urged the district court to divide their assets and debts according to that historical practice—or what Billy termed their "precursor financial divorce."  The district court rejected that approach, reasoning: "Billy wants a prenup postnup.  If Billy wanted such to be the case, he could have filed for legal separation or dissolution in 2007.  He did neither."  Declining to "wind the clock back seventeen years," the court included all the assets and debts of the Oyadares in the divisible marital estate and awarded Sarah attorney fees.

Billy appeals, claiming the district court erred by (1) "ignoring the established and uncontested evidence of agreement and practice of the parties regarding asset distribution"; (2) failing to find that Sarah dissipated assets during the marriage; and (3) awarding Sarah attorney fees.  We affirm the court's dissolution decree and remand for a determination of reasonable appellate attorney fees for Sarah.

I.      **Background Facts and Proceedings**

Sarah and Billy were married in Nigeria in 1998.  They moved to Iowa the next year, where they had three children together.[1]  In 2001, they each pursued further education.  Sarah enrolled in a nursing program at a community college, and Billy began law school.  They each took out student loans to pay for their education.   Sarah borrowed less than $5000, while Billy's loans totaled

---

[1] The two oldest children were adults by the dissolution trial.  There are no issues involving the youngest child in this appeal.

$98,608.69. According to Billy, the couple used "a big chunk" of his loans for living expenses while they attended school.

Sarah graduated before Billy and began working full-time while he finished his third year of law school. After Billy graduated in 2004, the family moved to Sioux City, where Billy obtained a job with the state public defender. He is still employed there and earns a gross annual income of $132,829. Sarah works as a nurse at a retirement home, where she grosses $100,454 per year.

In 2007, the couple decided to separate their finances. Sarah testified that her mother's health was the impetus for this decision: "My mom needed some money for . . . medical expenses, and I told Billy, and he said no, we can't send any money to anybody." Billy, however, said that Sarah wanted separate accounts because she didn't want to pay for his student loans. Whatever the reason, from then on Sarah and Billy maintained separate accounts, which they used to pay for their individual cars, credit cards, and student loans. They also maintained a joint account, into which they each contributed $800 per month to pay for "expenses of the family," like the mortgage.

Sarah agreed that she and Billy had "two different financial philosophies." Sarah focused on her cultural and familial connections, taking several trips to Nigeria, South Africa, and Europe, where the couple's families lived. She took the children with her on some of those trips, which she financed with credit cards. She also regularly sent money to family members in Nigeria. And she bought a property there with her mother. Billy did not travel with Sarah, choosing to instead pay off his student loans and start college savings accounts for the children, although he also sent money to his family in Nigeria.

By February 2022, the parties decided they should separate not just their finances but also their lives. They scheduled a mediation for October, before either had filed for divorce. One morning after Sarah got home from working an overnight shift, Billy presented her with a document that he said needed to be signed and sent to the mediator. Sarah testified that she signed it without reviewing it thoroughly. When the document was discussed at mediation, Sarah discovered that it was a settlement agreement. Because she did not agree to most of it, she retained an attorney and petitioned for divorce in November. Trial was scheduled for August 2023.

Two weeks before trial, Sarah moved to compel discovery from Billy, who represented himself in the proceedings. Following a hearing, the district court granted the motion but denied Sarah's request for attorney fees. The court warned Billy, however, that failure to produce the outstanding discovery could lead to continuing the trial or other sanctions. Billy did not heed that warning and failed to fully respond to Sarah's discovery requests by the court's deadline. As a result, the court continued the trial to January 2024.

The day before trial, Sarah filed a pretrial stipulation as directed by the district court's trial scheduling order. But it did not include Billy's required portion. So, on the day of the trial, the court delayed the proceedings for one hour so that Billy could complete his part. He did so by making handwritten notations on Sarah's proposed property division spreadsheet. While the parties agreed on the values for all their assets and debts, Billy maintained most were nonmarital, arguing "the parties have lived separate lives, kept their individual finances separate, pursued their financial goals independently and made financial decisions

based on their own individual preferences and without consultation with the other." He offered the settlement agreement that Sarah signed before their mediation as an exhibit, which he contended "was a codification" of their "oral agreement on how we were going to run our expenses." The court admitted the exhibit, "not to document any negotiation or agreement," but for context on "how the parties managed their finances together."

In the ensuing dissolution decree, the district court rejected Billy's proposed division, finding "[i]t is of no consequence whose bank account it was deposited in as there is truly only one bank account: the marriage's." The court also rejected Billy's alternative argument that Sarah dissipated assets through her credit card debt and the money she sent to family in Nigeria. With those arguments out of the way, the court equally divided all the parties' assets and debts, which resulted in Billy owing Sarah a cash equalization payment of $42,649. The court also awarded $2897.50 in attorney fees to Sarah.

Billy appeals, challenging the court's property division as inequitable because it varied from the parties' financial agreement during the marriage. He also claims the court erred in rejecting his dissipation claim and ordering him to pay Sarah's attorney fees.

## II.    Standard of Review

"We review dissolution cases de novo." *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). "Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses." *Id.* (citation omitted).

## III. Analysis

### A. Property Division

The focus of Billy's appeal is on the parties' agreement during their marriage to separate their finances in what he characterizes as a "precursor financial divorce." He likens that decision to an oral postnuptial agreement that he asserts must be enforced when dividing their property. We disagree.

In divorce cases, "marital property is to be divided equitably, considering the factors outlined in Iowa Code section 598.21(5)." *In re Marriage of McDermott*, 827 N.W.2d 671, 678 (Iowa 2013). None of those factors expressly authorize or require enforcement of postnuptial agreements. *See Hussemann ex rel. Ritter v. Hussemann*, 847 N.W.2d 219, 224 (Iowa 2014) ("Although our legislature has authorized antenuptial agreements, it has made no such allowance for postnuptial agreements."). While section 598.21(5)(k) allows the court to consider "[a]ny *written* agreement made by the parties concerning property distribution," the primary agreement that Billy seeks to enforce is oral. (Emphasis added.) Oral agreements between spouses may be considered under the catchall "[o]ther factors" provision in section 598.21(5)(m), *see In re Marriage of Johnson*, 350 N.W.2d 199, 201–02 (Iowa 1984), but the court is not required to do so. Even with a written postnuptial agreement, this court has held that the agreement is only "*one of the factors to consider in determining an equitable property distribution*" under section 598.21(5) and that it "is not binding on the ultimate distribution of property." *In re Marriage of Hansen*, No. 17-0889, 2018 WL 4922992, at *6 (Iowa Ct. App. Oct. 10, 2018). Thus, in applying the factors set out in section 598.21(5), "the district court may consider the terms of a postnuptial agreement, ignore its terms

as inequitable, or adopt its terms in full or in part." *Id.* at *4. We accordingly find no error in the court's refusal to entertain Billy's precursor-financial-divorce idea.

Nor did the court err in how it handled the pre-dissolution settlement agreement, which Billy argues documented the parties' "oral covenant during the subsistence of the marriage, once they decided to end the marriage." The court admitted the agreement into evidence to provide context about the parties' finances during the marriage. But it placed no weight on the agreement in the dissolution decree because Sarah signed it one month before the dissolution without the advice of counsel and because the court was concerned "the document inequitably financially advantage[d] Billy." *See Roberts v. Roberts*, 6 N.W.3d 730, 738 (Iowa 2024) ("One risk of postmarital agreements is that the spouse with economic leverage (or some other type of leverage) may be able to take advantage of the other spouse."). The court also rejected Billy's argument that "because he and Sarah had their 'own' checking accounts in 2007 (with an agreement that their personal expenses come from such accounts) . . . any accumulation of assets or debts henceforth were not marital in nature," finding that "contention is not grounded in law." We agree on both counts.

Our equitable distribution statute "is written to define divisible property as 'all property' of the parties, other than the two classes of excluded property"— inherited property and gifts received by one party. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (quoting what is now Iowa Code § 598.21(5)). "This broad declaration means the property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party." *Id.* "More importantly, the statute

makes no effort to include or exclude property from the divisible estate by such factors as the nature of the property of the parties, the method of acquisition, or the owner." *Id.*

Because "all property" is included in the divisible estate, the district court correctly rejected Billy's attempt to set aside most of the parties' assets and debts as nonmarital based on how the Oyadares handled their finances during the marriage. Instead, the "circumstances and underlying nature of the included property are generally considered as factors that impact" the task of determining an equitable division, along with all the other factors listed in section 598.21(5). *Id.* at 498. After considering those factors upon our de novo review of the record, we see no reason to adopt the uneven distribution proposed by Billy in this long-term marriage.[2] The district court's equal property division was equitable. *See McDermott*, 827 N.W.2d at 682 (stating equality is "often most equitable").

Billy alternatively claims that if an "equality approach" is adopted, Sarah's share must be adjusted for her dissipation of assets during the marriage. *See In re Marriage of Kimbro*, 826 N.W.2d 696, 701 (Iowa 2013) (setting out a two-prong test for courts to use in analyzing claims arising under the dissipation doctrine). He argues that the court should have given him credit for "the vast amount" of money that Sarah "sent to her family during the course of the marriage" and excluded her credit card debt from its property division. We disagree.

---

[2] This includes the arguments that Billy scatters throughout his appellate brief, seeking "a 50% refund" for the amount he paid for his student loans and the older children's college expenses during the marriage; requiring Sarah to assume one-half of his car loan; and requesting a credit for the mortgage payments that he made during the parties' separation.

Our supreme court has stated that the "dissipation doctrine applies when a spouse's conduct *during the period of separation* 'results in the loss of disposal of property otherwise subject to division at the time of divorce.'" *Id.* at 700–01 (emphasis added) (citation omitted). Both Billy and Sarah sent money to their families in Nigeria throughout their marriage. *See id.* at 701 (considering whether the "expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage"). And Sarah paid off much of the credit card debt that Billy seems to be complaining about years before the dissolution. Some of that debt was used to pay for the trips that Sarah and the children took to see the couple's families overseas. We agree with the district court that "[j]ust because Billy did not want to join the family on the trips back to Nigeria does not mean the trips were nonmarital in nature nor a dissipation of joint marital assets."

As for the credit card debt that Sarah still owed, she testified that some of it was incurred to buy new furniture after she left the marital home and to help pay for some of her living expenses. *See In re Marriage of Drenter*, No. 17-1548, 2019 WL 478195, at *2 (Iowa Ct. App. Feb. 6, 2019) (finding a spouse's expenses in transition from married life to single life did not support a finding of dissipation). She also used her credit cards to pay for her tuition when she returned to nursing school full-time in 2021 and could not work. In examining these expenditures, the court found Billy's "attempted portrayal of Sarah as an irresponsible spendthrift" was not credible. We defer to that credibility finding and affirm the court's determination that Sarah did not dissipate assets.

### B.    Trial Attorney Fees

Of the $18,343.51 that Sarah sought in trial attorney fees, the district court awarded her only the fees she incurred "for the Motion to Compel: $2,897.50." Billy claims the court erred in requiring him to pay that amount because its earlier ruling on Sarah's motion to compel denied her request for attorney fees. But the court's order on that motion cautioned Billy that if he missed the deadline to produce the missing documents, he could be subject to other sanctions. Billy missed the deadline, and the trial was continued. Sarah incurred more attorney fees as a result, while Billy incurred no attorney fees since he was representing himself. Considering the reasonableness of the fee and the parties' abilities to pay, we find no abuse of the court's broad discretion. *See In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993).

### C.    Appellate Attorney Fees

Sarah also seeks an award of appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). We must consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal," *id.*, as well as "whether a party has been obliged to defend the trial court's decision on appeal," *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013).

We find an award of appellate attorney fees is appropriate under these factors. But because Sarah did not file an attorney fee affidavit on appeal, we

remand to the district court to determine the amount that should be awarded.  *See*

*In re Marriage of Kisting*, 6 N.W.3d 326, 338 (Iowa Ct. App. 2024).

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**